UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TCHO MBAIMBA CAULKER,

    Plaintiff,

v.

MICHIGAN STATE UNIVERSITY,
DR. SCOTT JUENGEL,
and DR. ELLEN POLLAK

    Defendants.
                                   /

Case No. 1:09-CV-125

HON. GORDON J. QUIST

## **OPINION**

### Introduction

Plaintiff, Tcho Mbaimba Caulker, received his Ph.D. from Michigan State University ("MSU"). He has now sued the University and two of his former professors, defendant Scott Juengel and defendant Ellen Pollak. Plaintiff seeks to allege federal claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Count I), and 42 U.S.C. § 1983 (Counts II to IV), as well as several state law claims (Counts V & VI), all based on alleged discrimination and unequal treatment Plaintiff received during his doctoral program. Defendants have moved to dismiss Plaintiff's claims under Rule 12(b)(6). Because of the detailed facts and conclusions set forth in the Amended Complaint, the Court does not believe that oral argument would be helpful. For the reasons set forth below, the Court will grant the motion.

### Standard of Review

A civil complaint only survives a Rule 12(b)(6) motion to dismiss if "it contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Courie v.*

*Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (quotations and citations omitted). This standard is designed to screen out the "little green men" cases and "cases that, while not utterly impossible, are 'implausible.'" *Id.* at 630 (citations omitted). Although courts must take a liberal view of this standard, "it requires more than the bare assertion of legal conclusions." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citations omitted). Finally, the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965 (citing 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2004)).

**Facts**

In the fall of 2004, Plaintiff was Defendant Juengel's teaching assistant for MSU's English Department. (First Am. Compl. ¶ 14.) On a walk back from class in late November, Juengel allegedly made comments regarding the need to "weed students out of the program" who do not belong. (*Id.*) Apparently interpreting this comment as racist, the next day Plaintiff emailed Juengel to express his concern about these comments. (11/30/04 Email from Caulker to Juengel, Pl.'s Ex. 1.)[1] Plaintiff said that the comments frightened him and "that many who come from cultural backgrounds that have commonly been excluded would have been frightened as well." (*Id.* at 1.) Additionally, Plaintiff said, "I realize that you spoke out of a genuine benevolent concern about the

---

[1] Plaintiff attached eleven exhibits to his complaint and referenced these exhibits in his first amended complaint. Pursuant to Rule 10©, the Court will consider these exhibits part of the pleading for all purposes.

2

need to raise departmental standards." (*Id.*) In his response, Juengel stated, "I guess I just wasn't following what you were after this afternoon. If I was on the wrong track let me know: I certainly value your observations if you think I'm doing something to 'alienate' our 'minority' students, which is what it sounded like at times." (*Id.*)

Two months later, on Friday, January 28, 2005, Pollak told Plaintiff that his PhD comprehensive examination was approved and that he could take the exam on February 4, 2005. (1/28/05 Email from Pollak to Caulker, at 1, Pl.'s Ex. 2.) The next day, Juengel informed Plaintiff that there was a mix-up and Plaintiff's proposal did not go through the grad committee since that committee was busy working on the next year's incoming fellowships, which had January deadlines. (1/29/05 Email from Juengel to Caulker, at 1, Pl.'s Ex. 3.) Juengel gave Plaintiff the option of taking his comprehensive exam either the weekend of February 4 or February 25. (*Id.*) Juengel explained that it "usually takes a couple of weeks" to gather questions from committee members, but that he thought "either way will work" and asked Plaintiff to let him know as soon as possible if Plaintiff wanted to take the exam the weekend of February 4. (*Id.*) No where in his amended complaint, which is very detailed with many exhibits attached, does Plaintiff claim that he responded to Juengel's January 29, 2005, email.

Two weeks later, on February 13, 2005, Juengel confirmed that Plaintiff was scheduled to take his comprehensive examination the weekend of February 25. (2/13/05 Email from Juengel to Caulker, at 1, Pl.'s Ex. 4.) Juengel also noted that the oral examination "is supposed to take place within two weeks of the exam, but that falls within Spring Break" and that Plaintiff was traveling in the United Kingdom for an unspecified amount of time. (*Id.*) Plaintiff sat for his comprehensive exam the weekend of February 25, and had his oral defense on April 13, 2005, six weeks after his exam. (First Am. Compl. ¶¶ 23, 27.) Plaintiff claims his oral defense was in an "harassing and

3

hostile academic environment." (*Id.* at ¶ 28.) After Plaintiff submitted an amendment to his comprehensive exam on May 29, 2005, Plaintiff met with Juengel on May 31. (*Id.* at ¶¶ 41-42.) In this meeting, Juengel notified Plaintiff that his work was approved and he could commence the next phase of writing his dissertation proposal. (*Id.* at ¶ 43.)

On August 29, 2005, Plaintiff submitted the first draft of his dissertation proposal to Juengel. (*Id.* at ¶ 44.) After a working lunch with Juengel on September 7, Plaintiff submitted a second draft of his proposal on September 22, 2005. (*Id.* at ¶¶ 46, 48.) In an October 11 meeting to discuss his second proposal, Juengel allegedly told Plaintiff to "change" language in his proposal regarding the manner in which race and ethnicity affect worldview. (*Id.* at ¶ 50-52.) On October 16, 2005, after further revisions were made, Juengel approved Plaintiff's dissertation proposal. (*Id.* at ¶ 54.)

Two days later, Plaintiff met with Dr. Salah Hassan to complain about perceived problems of working with Juengel. (*Id.* at ¶¶ 57-58.) Plaintiff alleges that Dr. Hassan "spoke to the Plaintiff about the racist climate in the department, and said that the Plaintiff didn't have to put up with it." (*Id.* at ¶ 60.) Plaintiff also claims that Dr. Hassan told Plaintiff that he could change his dissertation committee, but that Plaintiff should cite "professional reasons" for the change. (*Id.* at ¶ 61.) On November 15, 2005, Plaintiff met with Juengel to tell Juengel that he was no longer a member of Plaintiff's dissertation committee. (*Id.* at ¶ 62.) Plaintiff also delivered a letter intended for Pollak to the English Department's secretary that notified Pollak that she was removed from Plaintiff's dissertation committee. (*Id.* at ¶ 68.) On December 6, 2005, Plaintiff signed the official "Change of PhD Guidance Committee" form, installing Drs. Hassan and Ken Harrow as co-chairs of Plaintiff's dissertation committee. (*Id.* at ¶ 70.) Plaintiff also met with Dr. Jyotsna Singh, who allegedly told Plaintiff that Juengel and Pollak were discussing Plaintiff's academics with other students. (*Id.* at ¶ 72.) Plaintiff claims that from around this time until his graduation, he sought

4

to thwart contact and harassment by avoiding the English Department building and showing up late to, and leaving early from, job talks and conferences. (*Id.* at ¶ 77.)

In mid-January, 2006, Dr. Justice Nieland, a friend of Juengel, allegedly scowled, stared, and "attempted to intimidate" Plaintiff in a Kinko's store. (*Id.* at ¶ 75.) One month later, on February 15, 2006, Plaintiff's new dissertation committee met and approved his dissertation proposal. (*Id.* at ¶¶ 78-79.) On February 23, 2006, Plaintiff submitted a research funding request to the English Department's secretary. (*Id.* at ¶ 84.) On March 2, the secretary emailed Plaintiff to say that Plaintiff used the wrong form for the request. (3/7/06 Email from Campbell to Caulker, at 1-2, Pl.'s Ex. 9.) Plaintiff responded four days later, stating that the form he used was for funds to research collections in the United States. (*Id.* at 1.) The Department's secretary replied the next day that there was a different form for research travel, but that she would fill out the appropriate form for Plaintiff and ask Dr. Hassan to sign the form on Plaintiff's behalf. (*Id.*) On March 24, 2006, Plaintiff was awarded a $500 research fellowship and $250 in research funding. (First Am. Compl. ¶ 94.) On April 7, Plaintiff was awarded the King-Chavez-Park Future Faculty Fellowship for the 2006-2007 and 2007-2008 academic years. (*Id.* at ¶ 98.) Ten days later Plaintiff "informed Defendant Pollak that he would not be accepting a Teaching Assistant position" and that he would use "his Future Faculty Fellowship to complete his work" and avoid future harassment. (*Id.* at ¶ 100.)

On June 22, 2006, six months after Plaintiff officially changed his dissertation committee, Plaintiff received an email from Juengel asking Plaintiff about the dates of his comprehensive examination so that Juengel could complete Plaintiff's official paperwork. (*Id.* at ¶¶ 102-03.) Plaintiff did not respond to this email. (*Id.* at ¶ 104.) Around the same time, Mr. Kuria Githiora, an English PhD candidate, told Plaintiff that he noticed Plaintiff was still listed as "Doctoral

5

Student" in the MSU online directory rather than "PhD Dissertation," a designation that signifies a candidate has passed the comprehensive examination. (*Id.* at ¶ 106.) Plaintiff emailed Dr. Hassan to express his concern about this error, and Dr. Hassan replied that "it's simply a bureaucratic matter, and that Plaintiff shouldn't worry because he was on track." (*Id.* at ¶ 108.)

Plaintiff completed the first draft of his dissertation on September 12, 2006. (*Id.* at ¶ 109.) Six weeks later on October 31, 2006, Juengel and Pollak signed Plaintiff's official papers stating that Plaintiff passed his comprehensive examination. (*Id.* at ¶ 116.) Plaintiff notes that the official papers had the wrong dates for his comprehensive examination and oral defense. (*Id.* at ¶ 117.) On December 7, 2006, Plaintiff met with Assistant Dean of the MSU Graduate School, Dr. Yvonne Smith, who was in charge of Plaintiff's fellowship award. (*Id.* at ¶ 119.) In this meeting, Plaintiff claims Dr. Smith told him to "keep quiet" about his case of discrimination if he hoped to complete his PhD. (*Id.* at ¶ 120.) Plaintiff states that the specific words Dr. Smith used were "'never let them steal your energy'" and that Plaintiff "should not risk his career because 'we (as in minorities) need you out there.'" (*Id.* at ¶ 122.) Plaintiff then traveled abroad to an unspecified location for an unspecified period of time. (*Id.* at ¶ 123.)

Upon Plaintiff's return to MSU, Plaintiff met with Drs. Hassan and Harrow on April 16, 2007, for a final conference before his PhD dissertation defense. (*Id.* at ¶ 124.) Plaintiff's dissertation defense was on April 30, 2007, and Plaintiff passed. (*Id.* at ¶¶ 128-29.) At this time, Plaintiff was not published and the job market season would not resume until the fall of 2007. (*Id.* at ¶ 130.) Therefore, Plaintiff decided to delay the submission of his dissertation until the 2007-2008 academic year to allow him to continue receiving his fellowship funding and insurance. (*Id.* at ¶¶ 131-32.)

In August 2007, Plaintiff requested letters of recommendation from his dissertation committee members for PhD job applications. (*Id.* at ¶ 133.) Plaintiff abstained from attending the English Department's October 2007 PhD job preparation sessions because Juengel and Pollak, as well as Dr. Neiland, were running the sessions. (*Id.* at ¶ 134.) In January 2008, Plaintiff applied for spring semester graduation, and in February Plaintiff submitted his dissertation and paperwork to MSU's Graduate School. (*Id.* at ¶¶ 135-36.) The MSU registrar emailed Plaintiff on March 12, 2008, to inform him that his PhD had been conferred, effective May 2008. (*Id.* at ¶ 138.)

In June 2008, Plaintiff emailed Drs. Harrow and Hassan with an update. (6/8/08 Email from Hassan to Caulker, at 1-2, Pl.'s Ex. 10.) Plaintiff commented he had a good working relationship with his publishers and that he wanted to add an additional chapter before his manuscript's delivery date on September 1, 2008. (*Id.* at 1.) Plaintiff also stated that "for personal reasons, I've decided that right now it's better for me to take a visiting professor position, as opposed to a tenure-track position." (*Id.* at 2.) Plaintiff noted that "there are several things in my life that are in flux right now that are preventing me from committing to a tenure-track position; and I would risk burning bridges if I were to take a tenure-track [sic] job, only to leave it one year later." (*Id.*) Plaintiff then listed four universities where he had an option to take a visiting professor job. (*Id.*) In response, Dr. Hassan observed that two professors left the English Department. (*Id.* at 1.) Dr. Hassan also said, "But as you know only too well, English depts [sic] and out [sic] graduate program in particularly [sic] have never been great at dealing with race, international students and remain thoroughly colonialist in their system of values." (*Id.*)

In July 2008 Plaintiff accepted a Practitioner-in-Residence position at the University of New Haven for $17,250 per year. (First Am. Compl. ¶ 140.) Finally, Plaintiff claims that Juengel created a document labeled "Teaching Assessment of Tcho Caulker" in October 2008, and placed this

7

document in Plaintiff's academic file in the fall of 2008 when Plaintiff retained counsel.² (*Id.* at ¶¶ 141-42.)

**Discussion**

Plaintiff claims he "has suffered professional and financial losses directly caused by the racial discrimination, harassment, and retaliation in the excessive delay in his studies and graduation from the English Graduate Program." (*Id.* at ¶ 145.) Plaintiff's amended complaint, however, is riddled with conclusory statements and lacks any coherent logical reasoning. *See, e.g.*, *id.* at ¶ 15 (Juengel made "racist / bias comment . . . about the need to 'weed students out of the program, [sic] who don't belong.'"); *id.* at ¶ 28 (Plaintiff's oral defense was in a "harassing and hostile academic environment"); *id.* at ¶ 64 ("Defendant Juengel was very arrogant and condescending to the Plaintiff"); *id.* at ¶ 65 ("Defendant Juengel continued this harassing behavior as the Plaintiff left his office."); *id*. at ¶ 134 (Plaintiff avoided job preparation sessions "because of the intimidating and harassing environment"). Cutting through all of the paragraphs in the amended complaint (216) and reading all of the documents submitted with the complaint leads to the simple conclusion that Plaintiff's graduation was delayed somewhat because Plaintiff went on sojourns abroad and took other respites from his studies. Furthermore, the fact that Defendants did not sign Plaintiff's official papers until October 2006 did not have any effect on Plaintiff's graduation date. It is noteworthy, up front, that both Juengel and Pollak were off of Plaintiff's Ph.D. Guidance Committee on December 6, 2005, at the latest. From that point on, Plaintiff was operating under the wings of his self-chosen committee, none of whom is subject to Plaintiff's claims. Finally, while Plaintiff alleges

---

²Although a motion to dismiss is generally confined to the pleadings, the Sixth Circuit has held that a court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). Defendants attached the teaching assessment as Exhibit 1 to their brief in support of Defendants' motion to dismiss.

8

scowls, stares, snickers, and sneers, these "petty slights, minor annoyances, and simple lack of good manners" are insufficient to support a claim of retaliation or discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006) (citations omitted). After all, the law does not enshrine "a general civility code for the American workplace." *See id.* All of this having been said, the Court will address the legal bases for its rulings.

I.   **Count I: Plaintiff's Title VI Claim**

Title VI prohibits the exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on the ground of race, color, or national origin. 42 U.S.C. § 2000d. It is undisputed that Juengel and Pollak were employees of MSU, which is a public education institution that receives federal assistance.

Plaintiff can prove his case of intentional discrimination by showing direct evidence of racial discrimination or establishing a *prima facie* case.[3] *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Direct evidence of discrimination usually requires a clear assertion that the plaintiff was treated adversely based on his race. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). To establish a *prima facie* case of discrimination, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse action; and (4) a casual connection between the plaintiff's protected status and the adverse action. *See Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). Under either approach, a plaintiff must show some discriminatory act and causation. *See Peters v. Jenney*, 327 F.3d 307, 321 n.15 (4th Cir. 2003) (stating that the *McDonnell Douglas* framework does not alter the elements of a Title VI claim, only the manner in which a plaintiff can prove causation).

---

[3]The Sixth Circuit has not decided whether the *McDonnell Douglas* burden-shifting framework applies to Title VI claims. *See Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006) (citing *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 508 (6th Cir. 2003) (applying *McDonnell Douglas* framework to a Title VI claim)). This Court does not presume to resolve the issue; rather, regardless of the analytical framework employed, the Court finds Plaintiff fails to allege a discriminatory act and a causal connection. Thus, Plaintiff fails to state a Title VI claim upon which relief can be granted.

Here, Plaintiff fails to show an adverse action and causation. In his amended complaint, Plaintiff first claims that Juengel's and Pollak's "delay of his [Plaintiff's] degree and graduation was an adverse action." (First Am. Compl. at ¶ 153.) The facts as pled by Plaintiff, however, do not support his contention. Plaintiff alleges that his comprehensive exam date was moved from the weekend of February 4, 2005, to February 28, 2005. (1/28/05 Email from Pollak to Caulker, at 1; 1/29/05 Email from Juengel to Caulker, at 1; Pl.'s Exs. 2-3.) Juengel did email Plaintiff stating that there was a "mix-up" with Plaintiff's exam proposal, but Juengel (1) gave Plaintiff the option of taking the exam on February 4 or February 28, (2) said he thought "either way will work," and (3) asked Plaintiff to let him know Plaintiff's preference as soon as possible. (1/29/05 Email from Juengel to Caulker, at 1, Pl.'s Ex. 3.) Plaintiff does not allege that he responded to Juengel's email and requested a February 4 exam. Instead, Plaintiff alleges that on February 13, 2005, Juengel responded to an email from Plaintiff to confirm that Plaintiff would take his comprehensive examination on February 25. (2/13/05 Email from Juengel to Caulker, at 1, Pl.'s Ex. 4.) Plaintiff cannot claim Defendants delayed his examination when Plaintiff had the option of taking his exam on February 4 but never asked to do so.

Furthermore, the comprehensive examination was one of many steps before Plaintiff could receive his degree. Plaintiff acknowledges that on May 31, 2005, two days after Plaintiff submitted a required amendment to his comprehensive examination, he met with Juengel and Juengel approved Plaintiff's work to allow Plaintiff "to move onto [sic] the next phase of writing his PhD dissertation proposal." (First Am. Compl. at ¶ 43.) Additionally, between August and October 2005, Plaintiff submitted three drafts of his dissertation proposal to Juengel. (*Id.* at ¶¶ 44, 48, 54.) Juengel met with Plaintiff to discuss Plaintiff's proposal eight days after the first draft, nineteen days after receiving the second draft, and five days after Plaintiff submitted the third draft. (*Id.* at ¶¶ 46, 50,

54.) In this last meeting on October 16, 2005, Juengel approved Plaintiff's proposal. (*Id.* at ¶ 54.) One month later, Plaintiff removed Juengel and Pollak from his dissertation committee. (*Id.* at ¶ 62.) It is not a discriminatory act to make a Ph.D. candidate submit three drafts of a dissertation proposal and then approve of the proposal within approximately three months of the first submission. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 n.11, 106 S. Ct. 507, 513 n.11 (1985) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." (citations omitted)).

Plaintiff also alleges that Juengel and Pollak did not sign the "official papers"[4] noting that Plaintiff passed his comprehensive examination until October 31, 2006, over a year after Plaintiff took the exam. (*Id.* at ¶ 116.) However, in each of the situations where there was a potential delay, Plaintiff failed to allege how the official papers, rather than his own actions, caused his delayed graduation. First, Juengel emailed Plaintiff on June 22, 2006, and asked Plaintiff to send him the dates of Plaintiff's comprehensive examination so that Juengel could complete Plaintiff's official papers. (*Id.* at ¶¶ 102-03.) Plaintiff never responded to Juengel's request. (*Id.* at ¶ 104.) Second, Plaintiff had just completed the first draft of his dissertation approximately six weeks before Juengel and Pollak signed the papers. (*Id.* at ¶¶ 109, 116.) Third, as of December 6, 2005, at the latest, Plaintiff's self-chosen committee was responsible for Plaintiff's progress towards a Ph.D. pursuant to the standards of MSU. Fourth, Plaintiff's amended complaint shows that he delayed his own graduation by traveling abroad for an unspecified amount of time between December 7, 2006, and April 16, 2007. (*Id.* at ¶¶ 120, 123.) Finally, even though Plaintiff had his dissertation defense on

---

[4] From what the Court can discern, the official papers are simply the forms indicating that Plaintiff has passed his comprehensive examination. Whatever they are, they had no bearing upon when Plaintiff obtained his Ph.D.

April 30, 2007, and passed, he decided to not submit his dissertation at that time because Plaintiff wanted to keep his fellowship funding and insurance, and to have time to work on being published. (*Id.* at ¶¶128-29, 131-32.) In fact, Plaintiff did not apply for graduation until January 2008, and he did not submit his dissertation and paperwork until February 2008, well over a year after Juengel and Pollak signed the official papers. (*Id.* at ¶¶ 135-36.)

Taking all of these factual allegations as true, Plaintiff fails to allege any facts showing that Juengel's and Pollak's conduct constitutes an adverse action that delayed Plaintiff's graduation. Indeed, the facts show that on several occasions Plaintiff had the opportunity to help expedite his doctoral program and Plaintiff chose to not respond to emails, chose to travel abroad, and chose to not submit a completed dissertation.

Plaintiff's second alleged adverse action is that Juengel and Pollak created red tape and denied Plaintiff research funds. (First Am. Compl. ¶ 87.) Again, the facts in the amended complaint do not support Plaintiff's contention. Plaintiff submitted a research funding request to the English Department's secretary on February 23, 2006. (*Id.* at ¶ 84.) The secretary emailed Plaintiff on March 2, 2006, to inform Plaintiff that he used the wrong form. (3/7/06 Email from Campbell to Caulker, at 1-2, Pl.'s Ex. 9.) Plaintiff replied on March 6, noting that language on the form indicated that he could use that particular form for researching funding requests. (*Id.* at 1.) The secretary responded the next day that there was a different form, but that the secretary would fill out the appropriate form for Plaintiff and that the secretary would also ask Dr. Hassan to sign the form on Plaintiff's behalf. (*Id.*) On March 24, 2006, Plaintiff was awarded a $500 research fellowship and $250 in research funding. (First Am. Compl. ¶ 94.) There is no allegation that either Juengel or Pollak had any input regarding Plaintiff receiving research funds, and Plaintiff actually received research funds fewer than thirty days after he applied.

12

Finally, Plaintiff alleges that he was denied the ability to participate in English Department functions, conferences, and job talks because friends and students loyal to Juengel and Pollak—not Juengel and Pollak themselves—would snicker and glare at him. (*Id.* at ¶ 77.) Snickers and glares from unidentified individuals constitute something less than a "suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965 (citations omitted); *see also Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993) ("The maxim *de minimis non curat lex* [the law does not care about trifles] retains force even in constitutional cases, even in civil rights cases. Its particular function is to place outside the scope of legal relief the sorts of intangible injuries normally small and invariably difficult to measure that must be accepted as the price of living in society rather than made a federal case out of.") (citations omitted)).

Therefore, Plaintiff fails to state a Title VI claim upon which relief can be granted and the Court will dismiss Plaintiff's Title VI claim against Defendants with prejudice.

## II. Counts II to IV: Plaintiff's 42 U.S.C. § 1983 Claims

Plaintiff sued Juengel and Pollak in their official capacities under 42 U.S.C. § 1983, alleging a First Amendment retaliation claim, violation of the Fourteenth Amendment's Equal Protection Clause, and a "class of one" violation of the Equal Protection Clause. (First Am. Compl. at ¶¶ 161-200.) A suit against a state official in his official capacity for monetary relief is barred by the Eleventh Amendment. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989) (holding that neither a state nor a state official in his official capacity is a "person" for purposes of a § 1983 damages action).

Even if Plaintiff properly sued Juengel and Pollak in their individual capacities, Plaintiff would still fail to state a claim upon which relief can be granted. Plaintiff's First Amendment retaliation claim cites the delay of his graduation as the chilling, adverse action. (First Am. Compl.

13

at ¶¶ 163-64, 169-76.) As noted above, the facts, as alleged by Plaintiff himself, do not show that anyone other than Plaintiff delayed his studies or his graduation. Similarly, Plaintiff's Fourteenth Amendment equal protection claim based on racial discrimination cites the denial of research funds and manufactured red tape that delayed his studies as the discriminatory conduct. (*Id.* at ¶¶ 178, 188.) As discussed above, Plaintiff was not denied research funds nor was Plaintiff's studies or his graduation delayed by Juengel and Pollak. Finally, Plaintiff's class of one equal protection claim cites the same academic delay discussed above. (*Id.* at ¶ 199.) Plaintiff also cites the fact that sometime around June 22, 2006, MSU's online directory still had Plaintiff listed as "Doctoral Student" rather than "PhD Dissertation." (*Id.* at ¶ 194.) Plaintiff does not allege that Juengel and Pollak had control over this online directory, nor does Plaintiff state how the online listing affected him in a non-trivial manner.

Therefore, Plaintiff's three claims under 42 U.S.C. § 1983 will be dismissed with prejudice.[5]

### III.    Statute of Limitations Bar

Even assuming *arguendo* that Plaintiff has stated claims, those claims are barred by the applicable statute of limitations. In Michigan, the statute of limitations for claims arising under Title VI and 42 U.S.C. § 1983 is three years. *See Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) (three year limitations period for § 1983 claims in Michigan); *see also Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996) (state personal injury limitations period applies in Title VI cases).

Plaintiff filed his complaint on February 13, 2009. To the extent that there was any discrimination, discriminatory acts that occurred prior to February 13, 2006 are barred by the statute

---

[5]"If the court finds no valid claim pursuant to 42 U.S.C. § 1983, the court need not reach the issue of qualified immunity." *Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998); *see also Blair v. Meade*, 76 F.3d 97, 100 (6th Cir. 1996) (noting that a court reaches the issue of whether the alleged right was clearly established only if it first concludes that the plaintiff has established a violation of a constitutional right). Here, Plaintiff failed to state a claim under 42 U.S.C. § 1983; thus, the Court does not need to address the issue of qualified immunity.

of limitations. For the reasons stated above, the Court finds that Plaintiff not only failed to allege any adverse action or discriminatory act, but Plaintiff also failed to allege any discriminatory conduct by the defendants that occurred within the limitations period. Thus, Plaintiff's Title VI and § 1983 claims are also barred by the statute of limitations.

## IV. Plaintiff's State Law Claims

Plaintiff alleges state law claims of tortious interference with business relationships and expectancies and gross negligence. Plaintiffs' state law claims will be dismissed pursuant to 28 U.S.C. § 1367(c)(3). *See Brannon v. Boatmen's Bancshares, Inc.*, 952 F. Supp. 1478, 1487-88 (W.D. Okla. 1997) (mem. op.) (dismissing plaintiffs' state law claims pursuant to § 1367© after dismissing RICO claim which was "sole basis" of federal jurisdiction), *aff'd*, 153 F.3d 1144 (10th Cir. 1998). "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) (citing *Transcon. Leasing, Inc. v. Mich. Nat'l Bank*, 738 F.2d 163, 166 (6th Cir. 1984)). Further, the Sixth Circuit has said that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson*, 89 F.3d at 1254-55; *see also Eubanks v. Gerwen*, 40 F.3d 1157, 1161-62 (11th Cir. 1994) (stating that when only state law claims remain, a federal court should decline jurisdiction by dismissing the case without prejudice) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 619 (1988) (footnote omitted)). Given the status of the case, the Court finds no compelling reason to deviate from the general rule by retaining jurisdiction over Plaintiffs' state law claims. Therefore, the Court will dismiss Plaintiff's two state law claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## Conclusion

For the foregoing reasons, the Court will grant Defendants' Rule 12(b)(6) motion to dismiss.

An Order consistent with this Opinion will be entered.


Dated: November 2, 2009                                             /s/ Gordon J. Quist
                                                                                             GORDON J. QUIST
                                                                         UNITED STATES DISTRICT JUDGE